**E-FILED**
Friday, 14 October, 2005 04:08:40 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## AT ROCK ISLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Criminal No. 04-40080** |
| **v.** | ) | |
| | ) | |
| **JOHNNY JOE DESILVA,** | ) | |
| **a/k/a Loco, a/k/a JJ, a/k/a Gordo,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES' TRIAL BRIEF AND <u>SANTIAGO</u> NOTICE OF INTENT TO PRESENT CO-CONSPIRATOR STATEMENTS

The United States submits this brief to assist the Court in its review of the facts and evidentiary issues that the Government anticipates may arise during the trial.

### I. The Racketeering Enterprise

The Latin Kings gang is a street gang that originated in Chicago, Illinois. As with most Chicago-based street gangs, the Latin Kings spread to other parts of Illinois where profits from marijuana and cocaine sales can be substantially higher. The Latin Kings is the largest Hispanic street gang in Chicago. In 1989 or 1990, The defendant and Jason Oliva established the Latin Kings in East Moline as a branch of the "Chicago 25th Street Spaulding Chapter." In 1993, the East Moline chapter received its own charter from the Latin Kings in Chicago to establish an individual "set," or subgroup of the Latin Kings. Among the initial members were The defendant, Jason Oliva, and Gilbert Venegas, all of whom were the organizing force and leaders of the gang. In the summer of 2001, the Davenport Latin Kings chapter merged with the East Moline chapter. Subsequent to the merger, the former Davenport Latin Kings attended the East

Moline gang meetings, called "juntas."  There were about 60 to 70 Latin Kings gang members in the East Moline chapter after the merger.

The Latin Kings' purpose is to establish and maintain control of lucrative drug markets in the cities to which it has spread, including East Moline, Illinois.  By doing so, ranking members are able to maintain a lifestyle which includes expensive cars, property and residences.  They also assert control over younger members and utilize the younger members to protect the gang turf and organizational pride.

The Latin Kings maintain a hierarchy of positions including five "Las Coronas," seven Regional "Officers" and seven Regional "Enforcers."  Each chapter of the Latin Kings street gang maintains its own leadership, including a Chapter "Inca" (or "Jefe"), Chapter "Casique" and a Chapter "Enforcer."  The Inca (first in command) and the Casique (second in command) are elected by the membership and are responsible for maintaining cohesion and discipline of the gang.  The Enforcer is appointed by the Inca and is responsible for security of the members, distributing weapons and selecting members to complete missions ordered by the Inca.  The defendant is the Regional Enforcer of the Quad Cities Latin Kings chapters, which includes the East Moline and Muscatine, Illinois chapters.  He is the highest ranking Latin King in the Quad Cities area.

The Latin Kings maintained various rules, the most important of which were silence and secrecy about gang activities.  Gang members also had to follow orders of gang leaders, including orders to carry out acts of violence.  Members were initiated into the Latin Kings by the process of a "violation", whereby one or more members would physically beat the initiate for a period of time.  Once initiated, a member was subject to further such violations for disregarding

the orders of the gang leadership or otherwise breaching discipline. The gang had regular meetings on the first Sunday of each month. Events that occurred during the previous month (primarily relating to conflicts with rival gangs) were discussed, violations were assessed against members for any rule violations, and dues were collected. The standard amount was $20 to $25 per member per month. The money was used to purchase drugs and firearms for the gang, pay lawyers hired to defend members, and post bail to free members from jail.

When firearms were purchased by the gang, they belonged to the entire membership. If a member wanted to use one of the guns, he had to seek permission from the chapter Enforcer. The weapons maintained by the Latin Kings included handguns and shotguns, and an assault pistol.

In common with other predominately Hispanic gangs in the area, the Latin Kings claim certain "turf" or territory as their own, which frequently leads to disputes with rival gangs who trespass into that territory. The Illinois Latin Kings are concentrated in central East Moline. Most live within a 10 by 7 block area. Since the mid-1990s, the Latin Kings have clashed with the Lowriders, Surenos and Outlaw Gangster street gangs, resulting in numerous beatings, shootings, stabbings and arsons. Since the Gangster Disciples gang folded in 1999 as a result of federal prosecutions, the Latin Kings have been the dominant street gang in East Moline.

The Latin Kings use various gang signs and symbols. The Latin Kings consider themselves a "People" gang and use a five-pointed star as a symbol, and so are enemies of "Folks" gangs (such as the rival Lowriders and Outlaw Gangsters gangs) that use a six-pointed star. The Latin Kings wear gold and black colors and mark their territory with graffiti, painting "LK" (for Latin Kings), or "LKN" (for Latin King Nation), or a King with a crown. Members

- 3 -

often mark their bodies with tattoos of these symbols as well as Spanish words or phrases such as "Amor de Rey," love to the king.

## II.    The Enterprise's Involvement in Racketeering Activity

The following facts outline the evidence as to the racketeering activity as alleged in Count Two of the Superseding Indictment, and to the corresponding count for using and carrying a firearm in connection with the attempted assault with a dangerous weapon alleged in Count Two.

<u>Violent crime activities</u>   The Latin Kings have been involved in numerous acts of violence since the early 1990s.  Samples of those that would qualify as racketeering acts within the meaning of Title 18, United States Code, Section 1961(1), include the following.

a.  On July 31, 1998, Latin King Daniel Jaramillo shot Armando Marquez, a member of the Lowriders street gang.  Fredrico Dena, Carlos Aceviz and Jose Perez were in Moline when he observed Marquez display a gun to them.  Dena, Aceviz and Perez went back to East Moline and told other Latin Kings what had happened.  Orlando Andrade provided a .22 or .25 caliber gun to Perez, Grijalva had a small pistol and Daniel Jaramillo had a rusty 9mm hand gun.  Andrade, Grijalva and Jaramillo then drove to Moline in Jaramillo's vehicle.  Jaramilla shot at Marquez five times hitting him in the leg and Marquez shot back three times, missing the Latin Kings.  Marquez was shot because he disrespected the Latin Kings.  Police recovered the Lowriders gun used by Marquez.  Officers also located five .32 caliber casings and five .25 caliber casings in the alley.

b.  On April 25, 2000, Latin King Carlos Aceviz attempted to shoot Anthony Banks, a member of the Gangster Disciples street gang.  Banks was throwing signs at three Latin Kings, Aceviz, Anthony Martinez and Johnnie Rigsby.  In response, Aceviz pointed a gun at Banks and

pulled the trigger twice.  When Aceviz was apprehended, police located a Tec-9 machine pistol in his pants.  The pistol had a bullet loaded in the chamber, but no magazine.  The magazine was located around the corner from where Aceviz was stopped.

    c.  On June 25, 2001, police responded to a shots fired call in East Moline.  Latin King Fredrico Dena had been at the residence of James Carpentier, a member of the Outlaw Gangsters.  A verbal argument broke out between Dena and Carpentier and Carpentier attacked Dena.  Dena escaped and yelled "I'm gonna shoot you," and left the area.  After about ten minutes, Carpentier heard shots at the front of his residence and four .22 caliber casings were located by police at the scene.  After the altercation with Carpentier, Dena contacted Mike Olvera and Jose Perez, fellow Latin Kings, for help in retaliation.  Olvera drove his car and Perez carried a .22 caliber handgun.  As they drove to Carpentier's residence, Perez leaned out the window of the car and fired at the residence.

    d.  On April 18, 2002, police responded to a mob action call in East Moline.  Numerous Latin Kings gang members, including Joshua Carlson, had blocked an alleyway at 14th Street and 15th Avenue.  A vehicle driven by a female carried two Outlaw Gangsters.  The Latin Kings began to throw bricks and bottles in a heavy assault at the vehicle.  One of the bricks struck the left rear cab glass and caused it to shatter.  The brick continued through the glass into the vehicle striking an Outlaw Gangster, Wayne Schumacher in the head.

    e.  On September 25, 2002, Latin Kings Leopold Delgado, Gabriel Vasquez, Abel Vasquez and Manuel Garcia were arrested by the Davenport Police Department.  The FBI had received information that the aforementioned Latin Kings were planning a retaliation against the Lowriders.  The suspects were followed into Lowriders territory in Davenport and stopped by the

police.  A loaded revolver was discovered inside the vehicle.  Several Latin Kings had a meeting and decided they wanted a Lowrider to die.  The retaliation would avenge a previous shooting of a Latin King by the Lowriders.  They were planning to use bottles filled with gasoline and rags to ignite and throw into a bar owned and occupied by Lowriders.  They also planned to shoot any Lowriders street gang member if they saw them in the area. They had received permission from the Chapter Enforcer, Joshua Carlson to do the mission.  The firebombing and shootings were averted by the arrests of the Latin Kings before they could carry out the mission.

The Attempted Aggravated Battery with a Firearm and Relation to the Enterprise

On July 3, 2002, the defendant was driving his black Oldsmobile Cutlass in the alley behind Manuel Garcia's house, when some Outlaw Gangsters were causing problems with him. The defendant got out of his vehicle and yelled at the Outlaw Gangster members.  He then turned and yelled at Garcia to "go light them up."  Garcia retrieved a large black handgun and ran to the corner and fired shots at the Outlaw Gangsters' vehicle.

Drug trafficking.  A sample of the drug trafficking activities engaged in by the Latin Kings is as follows.

Leo Reyes, a Latin King, took orders and collected money from other Latin Kings for the purchase of cocaine and marijuana.  The money from the sale of marijuana was funneled through Mike Olvera who was the chapter treasurer and some of the money was provided to the defendant.

The Latin Kings placed orders for drugs with the defendant through Jose Garcia-Martinez or Leo Reyes.  The defendant provided the drugs to Garcia-Martinez who distributed them to the Latin Kings.  Garcia-Martinez regularly made drug deliveries and collected drug debts for the

- 6 -

defendant.  Latin Kings, Joshua Carlson and Jose Garcia-Martinez were stopped by the East Moline Police in October 2003 and Garcia-Martinez was discovered to have one pound of marijuana on his person.  Garcia-Martinez was delivering the marijuana for the defendant.

## III.     Applicable Statutes and Offense Elements

### A.     Count One: Conspiracy to Distribute Cocaine and Marijuana.

The elements of a violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(D), and 846 (conspiracy to distribute five kilograms or more of cocaine and marijuana) are:

1.  The conspiracy to distribute, and possess with intent to distribute five kilograms or more of cocaine and marijuana, as charged in the Superseding Indictment existed; and

2.  The defendant knowingly became a member of the conspiracy with an intention to further the conspiracy.

### B.     Count Two: Violent Crime in Aid of Racketeering (Attempted Assault with a Dangerous Weapon)

The elements of a violation of Title 18, United States Code, Section 1959(a)(6) (VCAR – attempted assault with a dangerous weapon) are:

1.  The enterprise existed at the time charged;

2.  The enterprise, through its members and associates, was engaged in racketeering activity;

3.  The enterprise was engaged in, or its activities affected, interstate commerce;

4.   The defendant, acting with the requisite intent, committed the crime of attempting to commit assault with a dangerous weapon;

5.   The crime of attempting to commit assault with a dangerous weapon violated a specific state statute as charged; and

6.   The defendant attempted to commit the assault with a dangerous weapon  for the purpose of maintaining or increasing his position in the enterprise.

With respect to element (4) above, to sustain the underlying Illinois crime of attempting to commit aggravated battery with a firearm, the government must prove:

a.   The defendant performed an act which constituted a substantial step toward the commission of the offense of aggravated battery with a firearm; and

b.   That the defendant did so with the intent to commit the offense of aggravated battery with a firearm.

1.   <u>Enterprise Element</u>

The statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "There is no restriction upon the associations embraced by the definition: an enterprise includes any . . . group of individuals associated in fact," that is, any "group of persons associated together for a common purpose of engaging in a course of conduct."  <u>United states v. Turkette</u>, 452 U.S. 576, 580, 583 (1981).  Thus, the term "enterprise" includes "both legitimate and illegitimate, as well as formal and informal organizations."  <u>United States v, Torres</u>, 191 F.3d 799, 805 (7th Cir. 1999).

To constitute an enterprise, an organization need simply have "a structure and goals [that are] separate from the predicate acts themselves." United States v. Masters, 924 F.2d 1362, 1367 (7th Cir. 1996).

Thus, to establish that the Latin Kings is an "enterprise," the Government need merely show that the gang had an ongoing organization or structure, either formal or informal, beyond the minimum necessary to conduct the charged racketeering activity, and that the various members of the gang functioned as a continuing unit.

      2.     The State Law Violation

The crime of aggravated battery with a firearm is a violation of Illinois criminal law, specifically 720 ILCS 5/12-4.2(a)(1), and may be charged as an attempt under 720 ILCS 5/8-4.

      3.     Maintaining or Increasing the Defendant's Position in the Enterprise.

As indicated, the defendant, the Regional Enforcer of the Quad Cities Latin Kings, ordered Manuel Garcia, to shoot at members of the Outlaw Gangster street gang in retaliation for the encounter with the rival gang in an alley and as part of the gang rivalry between the Latin Kings and the Outlaw Gangsters. The shootings were in response to a direct order issued by the defendant. Manuel Garcia, who was 16 years old at the time, reported that he would have been punished if he had disobeyed an order from gang leadership.

**C.    Count Three:  Using/Carrying a Firearm**

The elements of a violation of Title 18, United States Code, Section 924(c)(1) (using and carrying a firearm) are:

      1.  The defendant committed the crime of attempted aggravated battery with a firearm as charged in Count 2 of the Superseding Indictment;

- 9 -

2.   The defendant knowingly used or carried a firearm during and in relation to said attempted aggravated battery with a firearm.

A defendant carries a firearm when he transports the firearm on his person or in a vehicle and does so during and in relation to the violent crime that he is committing.[1]

A defendant uses a firearm when he actively employs it in some way that is related to the violent crime that he is committing.  "Use" may include brandishing, displaying, striking with, firing, or attempting to fire a firearm or making reference to a firearm in the defendant's possession.  Mere presence of a firearm at the scene of the crime without active employment of that kind is not sufficient to constitute use of that firearm. [2]

One of the Government's theories of liability in connection with Counts 2 and 3 is based upon aid and abetting - the defendant may be found guilty if they knowingly aided, counseled, commanded, induced, or procured the commission of the aggravated battery with a firearm offense while knowingly associating with the criminal activity, participating in the activity, and trying to make it succeed.[3]

Another theory of liability is based on <u>Pinkerton v. United States</u>, 328 U.S. 640, 647-648 (1946), which holds that a conspirator is responsible for offenses committed by his fellow

---

[1]Seventh Circuit Pattern Jury Instructions (1999) at 237 ("18 U.S.C.§ 924(c); "Definition of Carry").

[2]Seventh Circuit Pattern Jury Instructions (1999) at 238 ("18 U.S.C.§ 924(c); "Definition of Use").

[3]Seventh Circuit Pattern Jury Instructions §5.06 (1999).

- 10 -

conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy.[4]

**D.     Counts Four and Five:  Interstate Communication of a Threat to Kidnap/Injure**

The elements of a violation of Title 18, United States Code, Section 875(b) (interstate communication of a threat to kidnap or injure) are:

  1.  The defendant knowingly transmitted a communication containing a threat to injure or kidnap the person of another, as charged in the Superseding Indictment;

  2.  The defendant transmitted that communication with intent to extort something of value; and

  3.  The communication was transmitted in interstate commerce.

**IV Evidentiary Issues**

**A.     Evidence of Gang Affiliation and Organization**

The Government will call to testify a number of Latin Kings members who will describe the gang's membership, practice, rules, organization, and activities, as well as the gang's symbols, signs, colors, and tattoos.

As indicated above, the Government is required to prove the existence of the Latin Kings and that they were the racketeering enterprise "described in Count 2 of the Superseding Indictment."  Seventh Circuit Pattern Jury Instructions (1999) at 320.

Since the evidence concerning association among the defendants and other members of the Latin Kings, and the gang's common use of signs, symbols, colors, tattoos, and graffiti is

---

[4]Seventh Circuit Pattern Jury Instructions § 5.10 (1999).

- 11 -

direct evidence of the existence of the Latin Kings enterprise as described in the Superseding Indictment, such evidence should be admitted at trial.

It is well settled in this circuit that "[e]vidence of gang affiliation is admissible in cases in which it is relevant to demonstrate the existence fo a joint venture or conspiracy, and a relationship among its members." United States v. Westbrook, 125 F.3d 996, 1007 (7th Cir.), cert. denied, 522 U.S. 1036 (1997); see also United States v. Sargent, 98 F.3d 325, 328 (7th Cir. 1996) (noting that evidence of "gang membership can be key to establish intent or agreement to conspire"); United States v. Rodriguez, 925 F.2d 1049, 1053 (7th Cir. 1991) (admitting testimony regarding roles of enforcer and soldiers in gang); United States v. Lewis, 910 F.2d 1367, 1372 (7th Cir. 1990) (deeming evidence of defendant's membership in one gang, information about rival street gang, and tattoos reflecting membership in gang admissible to establish joint venture and constructive ownership of firearms).

**B.      Evidence of Other Gang-Related Criminal Acts**

The Government also should be permitted to introduce evidence of criminal acts committed by the defendant and other members of the Latin Kings gang in order to meet its obligation to prove that the Latin Kings was a racketeering "enterprise."  Seventh Circuit Pattern Jury Instructions (1999) at 320.

The enterprise element requires the Government to prove that the Latin Kings were "the group described in [subparts 1,2,3, and 4 of Count 2] of the Superseding Indictment." Id. at p. 320.

Those subparts of the Superseding Indictment define the Latin Kings as a street gang whose objects and purposed included waging war against rival gangs, specifically:

- 12 -

-"to protect[ing] and defend[ing] territory . . . by acts of violence directed against members of rival street gangs, including the Outlaw Gangsters."  (Ind. p.2, ¶ 3) and,

-"obtain[ing] and collect[ing] firearms and other deadly weapons . . . to keep victims in fear, to retaliate against rival gangs, and to facilitate the distribution of controlled substances." (Ind. p.2, ¶ 4)

Given the requirement that the Government prove the existence of the Latin Kings enterprise as described above – an enterprise whose purpose was to wage gang war – evidence concerning uncharged, tit-for-tat acts of violence between the various gangs, including those committed by or directed at the Latin Kings, should be admitted.

This is because "[i]t is difficult to comprehend how one could prove the existence of an enterprise comprised of a 'group of individuals associated in fact,' and organized solely for the purpose of committing crimes, without presenting evidence of the crimes that detail the structure, common purpose, and continuity of the charged enterprise."  United States v. Salerno, 108 F.3d 730, 738-39 (7th Cir. 1997) (uncharged extortionate collections by defendants admissible to prove the enterprise).  See also United States v. Thai, 29 F.3d 785, 812-13 (2d Cir. 1994) (29 F.3d 785, 812-13 (2d Cir. 1994)(admission of uncharged extortion, robbery, and murder plans by the defendants admissible to prove the RICO conspiracy); United States v. Clemente, 22 F.3d 477, 483 (2d Cir. 1994)(defendant's uncharged acts admissible to prove existence of RICO enterprise); United States v. Eufrasio, 935 F.2d 553, 572-73 (3rd Cir. 1991)(uncharged murders and other mafia crimes admissible to show the existence and nature of the RICO enterprise and conspiracy).

This is true even when those incidents do not directly involve the defendants, but other members of the gang.  United States v. Keltner, 147 F.3d 662, 667-68 (8th Cir. 1998)(uncharged

criminal conduct by co-conspirator admissible to prove the enterprise); United States v. Brady, 26 F.3d 282, 287-88 (2d Cir. 1994)(uncharged murders by other members of the enterprise admissible to prove the enterprise); United States v. Gonzalez, 921 F.2d 1530, 1545-47 (11th Cir. 1991)(uncharged crimes by defendant and other conspirators admissible to prove the enterprise); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997)(evidence of uncharged murders committed by some defendants and other enterprise members admissible to show the existence of the enterprise); United States v. Krout, 66 F.3d 1420, 1425 (5th Cir. 1995)(admission of uncharged murders committed by the defendants was not prejudicial when admitted to prove that murder and extreme violence were part of the enterprise's objectives and manner and means); United States v. Ellison, 793 F.2d 942, 949 (8th Cir. 1986)(uncharged crimes of violence by other members of the enterprise admitted to show existence of the enterprise).

### C.     Use of Audio Tapes/CDs and Tape/CD Transcripts

The Government will seek to admit and to broadcast to the jury recordings of consensually monitored conversations involving the defendant and other co-conspirators.  In addition, the Government will seek permission to furnish the jury with written transcripts of the recordings which will identify the purported speakers and transcribe the substance of their communications.  Some of these recordings are in Spanish and have been translated.  The Government will seek permission to furnish the jury with the translated transcripts.

The trial court, upon clear and convincing evidence that a tape/CD is a true, accurate, and authentic recording of a given conversation, has broad discretion to admit the tape/CD in evidence.  United States v. Keck, 773 F.2d 759, 766 (7th Cir. 1985); United States v. Faurote, 749

- 14 -

F.2d 40, 43 (7th Cir. 1984).  Furthermore, only in extraordinary circumstances can the trial court's

determination be overturned on appeal.  Id.

In addition, trial courts have wide discretion to allow the jury to use written transcripts as

an aid in understanding audio tapes.  E.g., United States v. Camargo, 908 F.2d 179, 183 (7th Cir.

1990); United States v. Doerr, 886 F.2d 944, 966 (7th Cir. 1989); Keck, 773 F.2d at 766.  The

Seventh Circuit has "repeatedly . . . approved" the practice of allowing the jury to use written

transcripts during deliberations, as well as when the tapes are first played during trial.  Camargo,

908 F.2d at 183 (collecting cases); see also Doerr, 886 F.2d at 966.

The partial inaudibility of a tape renders it inadmissible only if the inaudibility casts into

doubt the trustworthiness of the entire recording.  The determination of trustworthiness rests

within the sound discretion of the trial judge.   United States v. Degaglia, 913 F.2d 372, 378 (7th

Cir. 1990); Camargo, 908 F.2d at 183; Zambrana, 841 F.2d at 1327.

### D.    Admissibility of Co-Conspirator Statements

During the course of the trial, the United States intends to present testimony regarding

statements by the defendant and his indicted and unindicted co-conspirators in furtherance of the

conspiracy.  Such evidence will be offered against the defendant, who was then a member of the

conspiracy.  In United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978) the Seventh Circuit

established standards for the admissibility of co-conspirator statements under Rule 801(d)(2)(E)

of the Federal Rules of Evidence.  The court held that in order for such statements to be

admissible against another defendant, the government must establish by a preponderance of the

evidence that first, a conspiracy to violate the law existed; second the declarants and the

defendant were members of the conspiracy when the statements were made; and third, that the statements were made in furtherance of the conspiracy.

The Santiago Court emphasized that the "ordinary civil standard" of the preponderance of evidence was appropriate for determining the admissibility of co-conspirator statements. It distinguished the preponderance standard with other higher thresholds, and defined such by concluding:

> If it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made and that the statement was in furtherance of the conspiracy, the hearsay is admissible.

Id. at 1134.

When determining preliminary questions of admissibility, a trial court is not bound by the Federal Rules of Evidence, and may inquire into anything that is relevant. Fed. R. Evid. 104(a)(b). Thus a court is permitted to evaluate virtually any proof, including the contested statements themselves, when making a preliminary determination of whether a conspiracy existed. Bourjaily v. United States, 107 S.Ct. 268 (1987), United States v. Jefferson, 714 F.2d 689, 696 (7th Cir. 1983), United States v. West, 670 F.2d 675, 684 (7th Cir. 1982), cert. denied, 457 U.S. 1124.

While the Seventh Circuit's opinion in Santiago suggests that a hearing outside the presence of the jury is one method for a trial court to determine whether the Government could meet its burden with respect to the admissibility of co-conspirator's statements, it further states:

> The trial judge retains the option of conditionally admitting the co-conspirator declaration evidence before the conspiracy has been independently established, but subject to the subsequent fulfillment of that critical condition.

- 16 -

United States v. Santiago, 582 F.2d at 1311.

Through its opinions in Santiago and related cases, the Seventh Circuit has clearly established that a trial court may conditionally admit co-conspirator hearsay statements subject to a connection, or fulfillment of that condition, by the end of the trial.  Id., United States v. Coe, 718 F.2d 830 (7th Cir. 1983), United States v. Azzarelli Construction Co., 612 F.2d 292, 297 (7th Cir. 1979).  In Azzarelli, the court found that a pretrial determination of the admissibility of co-conspirator statements is not required, and stated:

> Appellants further contend that declaration of co-conspirators were improperly received.  It is asserted that a pre-trial determination, akin to a motion to suppress, should have been made; and that findings should have been made showing why the evidence was admitted.  These steps are not required by the Federal rules of Evidence or by this Court's decision in United States v. Santiago, 582 F.2d 1128, 1131-36 (7th Cir. 1978).

> The normal practice, it would seem, would be for a defendant to object at the time the challenged statement is offered.  Thereupon, either during a recess granted the jurors or at side bar outside their hearing, counsel would present their respective reviews of the nature and effect of the state of the record with respect to the existence of sufficient evidence aliunde to justify admission of the testimony and the Court would rule.

United States v. Azzarelli Construction Co., 612 F.2d at 297.

## 1. General Conspiracy Law

The threshold requirement for admission of co-conspirator declarations is adequate proof of the existence of a conspiracy.  A conspiracy is an agreement between two or more persons to commit a crime.  United States v. Lechuga, 994 F.2d 346, 349-50 (7th Cir.)(en banc), cert. denied, 510 U.S. 982 (1993); United States v. Richardson, 130 F.3d 765, 772 (7th Cir. 1997).  To be a conspirator, a defendant must know of the agreement and intend to join in its criminal

purpose.  United States v. Jarrett, 133 F.3d 519, 533 (7th Cir.), cert. denied, 1998 WL 174835

(May 4, 1998); United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir. 1991).  A conspirator

need not join at the beginning, know all the other conspirators, have participated in every aspect

of the conspiracy, or know all the details about how its purpose is to be achieved.  Richardson,

130 F.3d at 773; United States v. Zarnes, 33 F.3d 1454, 1466 (7th Cir. 1994).

 "It is a basic tenet of conspiracy law that a new party can join a single, ongoing

conspiracy at any time. . . .  [P]arties may still be found guilty even though they may join or

terminate their relationship with the core conspirators at different times."  United States v.

Sababu, 891 F.2d 1308, 1322 (7th Cir. 1989).

 A buyer-seller relationship, standing alone, does not establish the existence of a

conspiracy.  Lechuga, 994 F.2d at 349; Townsend, 924 F.2d at 1394.  There must be "proof of an

agreement to commit a crime other than the crime that consists of the sale itself."  Lechuga, 994

F.2d at 347.  That "something more" necessary to find the existence of a drug distribution

conspiracy is generally a further agreement, often implicit, that the drugs involved in the sale will

be redistributed to someone else, although the agreement "conceivably could, in an ongoing

relationship, pertain to the prior procurement of the supply."  United States v. Clay, 37 F.3d 338,

341 (7th Cir. 1994).

 The most common evidence of an agreement between a buyer and seller to distribute

drugs to some third party or parties is that the seller "fronted" (sold on consignment, or credit)

some or all of the drugs to the buyer.  "This sort of credit transaction is strong evidence of

membership in a conspiracy."  United States v. Baker, 1 F.3d 596, 597 (7th Cir.), cert. denied,

510 U.S. 956 (1993).  The Seventh Circuit has "consistently held that evidence of 'fronting'

suggests the existence of a conspiracy because it appears both that the seller has a stake in the success of the buyer's activities and that a degree of cooperation and trust exists beyond that which results from a series of isolated and sporadic transactions." United States v. Dortch, 5 F.3d 1056, 1065 (7th Cir. 1993), cert. denied, 510 U.S. 1121 (1994).

Probably the next most common form of proof of a conspiratorial relationship is that of prolonged cooperation.  Lechuga, 994 F.2d at 350; United States v. Plescia, 48 F.3d 1452, 1460 (7th Cir.), cert. denied, 516 U.S. 836 (1995); United States v. Ferguson, 35 F.3d 327, 331 (7th Cir. 1994), cert. denied, 514 U.S. 1100 (1995); United States v. Zarnes, 33 F.3d 1454, 1465 (7th Cir. 1994); Dortch, 5 F.3d at 1065-66 (three transactions).  In Clay, the Seventh Circuit discussed how an implicit agreement may be inferred from a prolonged supplier-redistributor relationship, stating: "[E]ven without there ever being a formal statement of corroboration, as two parties continue on a course of conduct, this intent can boil down to a tacit, albeit somewhat nebulous, agreement to further the buyer's redistribution project, the seller 'join[ing] both mind and hand' with the buyer."  Clay, 37 F.3d at 341.  The Clay court went on to observe "that a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture is sufficient to sustain a finding of conspiracy."  Id.

Such mutual, forward-looking interest may be difficult to infer from a single spot sale for cash.

> But when a sales relationship is ongoing, seller and buyer will
> to some degree share an interest in the fortunes of the other: the buyer would like
> the seller to continue to have access to a supply and the seller would like the buyer
> to continue to have access to a market.  When one of these cross-interests is of
> sufficient strength, an appellate court will be satisfied with a jury or trial judge's
> inference that an explicit or implicit . . . agreement [to redistribute drugs] marked
> the relationship.

- 19 -

Id. at 341-42.

Among other factors which are indicative of a conspiratorial relationship between a seller and buyer are: the expectation of future transactions, Clay, 37 F.3d at 341; United States v. Fort, 998 F.2d 542, 546-47 (7th Cir. 1993) (single cash sale with promise of future transactions); the availability of supply or marketing alternatives, Clay, 37 F.3d at 341; the extent to which the transactions are standardized, Id.; Zarnes, 33 F.3d at 1465; United States v. Kozinski, 16 F.3d 795, 808 (7th Cir. 1994); Lechuga, 994 F.2d at 363-64 (Cudahy, J., concurring in part and dissenting in part); a demonstrated level of mutual trust, Clay, 37 F.3d at 342; and large quantities of drugs, Zarnes, 33 F.3d at 1465; Kozinski, 16 F.3d at 808; Lechuga, 994 F.2d at 347 (stating large amounts are probative, but not conclusive).

Another hallmark of conspiracies–indeed, a primary reason for their existence–is lower transaction costs than for spot transactions on the open drug market.  Conspiracies eliminate, or at least greatly reduce, the need for both the supplier and redistributor to search the open market before each transaction to determine with whom to conduct the next deal, to inform that person of one's desire to deal and on what terms, to conduct negotiations leading up to a bargain, to undertake the inspection and sometimes elaborate security precautions necessary to make sure that the terms of the bargain are observed, and so on.  Townsend, 924 F.2d at 1394.  Conspiracies reduce the time and effort, and often monetary price, of doing business, and are evidenced by cooperative arrangements to reduce such costs.

In contrast, non-conspiratorial, spot transactions on the open market are typically distinguished by higher transaction costs than in cooperative joint ventures.

> Evidence that the parties must negotiate the terms of every transaction, seek to maximize their gains at the expense of others, or engage in other forms of opportunistic behavior at the expense of the group, suggests that transaction costs among the group are high and counsel against a finding of conspiracy between its members.

Townsend, 924 F.2d at 1395.

A conspiracy can exist side by side and even overlap with another conspiracy.  One person can be a member of more than one conspiracy, just as one person can hold more than one job. Richardson, 130 F.3d at 774.

"Evidence of unexplained wealth is probative and therefore admissible if it creates a reasonable inference of the defendant's involvement in the drug conspiracy or trafficking." United States v. Penny, 60 F.3d 1257, 1263 (7th Cir. 1995), cert. denied, 516 U.S. 1121 (1996).

### 2.       The Conspiracy and the Defendant's Participation Therein

To assist this court in its preliminary determination of the admissibility of co-conspirator statements against the defendant, the United States herein offers the following outline of some of the evidence that the government will present at trial.  This proffer is not intended to be exhaustive or comprehensive, but instead reflects the existence of the conspiracy and the defendant's participation therein.

During David Robles' first contact with the defendant's father, John Joe DeSilva, Sr. in November, 2003, he informed Robles that he was returning from delivering a marijuana shipment in Illinois.  DeSilva, Sr. was looking for a driver to make deliveries of drugs from Eagle Pass, Texas to Illinois.

Robles and DeSilva, Sr. had several telephone conversations in December 2003 to arrange a delivery of marijuana concealed in a vehicle tire from Eagle Pass, Texas to Illinois.  On

December 14, 2003, Robles introduced two DEA undercover agents, David Bishop and Ken Brown, posing as drug couriers, to DeSilva, Sr. at a hotel in Eagle Pass, Texas. During the meeting, the undercover agents agreed to transport marijuana for DeSilva, Sr. from Eagle Pass, Texas to the Illinois Quad Cities. DeSilva, Sr. told the DEA undercover agents that he sold marijuana to his son "JJ," who in turn resold the marijuana in East Moline, Illinois.

On December 15, 2003, in accordance with their arrangements with DeSilva, Sr., the DEA undercover agents drove to DeSilva, Sr.'s residence in Eagle Pass. While at his residence, DeSilva, Sr. gave the undercover agents an air-filled tire mounted on a vehicle rim that contained marijuana and $500. DeSilva, Sr. showed the undercover agents a photograph of the defendant, and told the agents that when they arrived in East Moline, the defendant would pay them $3,500 for delivering the marijuana. The undercover agents then departed the area en route to East Moline, Illinois. Later on December 15, 2003, Robles left Eagle Pass en route to East Moline, Illinois with DeSilva, Sr. and another individual. Robles and DeSilva, Sr. arrived in East Moline on December 16, 2003. The defendant met them on the side of the road, and thereafter led them to American Auto.

When the marijuana was not delivered as arranged, the defendant called Robles and threatened harm to Robles and Robles's family if the marijuana was not delivered. In addition, both the defendant and DeSilva, Sr. called the DEA undercover agents numerous times, demanding that the tire with the marijuana be delivered to them.

On December 19, 2003, the defendant called Agent Bishop and informed him that the defendant was sending some girls down to retrieve his marijuana. Michelle Teran traveled to

Oklahoma City, Oklahoma to retrieve the marijuana and transport that marijuana back to the defendant in East Moline, Illinois.  Teran was to be paid by the defendant for the drug run.

On and after December 23, 2003, the DEA undercover agents received numerous calls from the defendant and DeSilva, Sr.  DeSilva, Sr. accused the undercover agent of stealing his marijuana.  DeSilva, Sr. stated that the undercover agent would regret messing with the DeSilvas.  During one call on December 24, 2003, the defendant told the undercover agent that he had a relative who was a Denton County, Texas sheriff's deputy, and they would find the undercover agent and take care of him.  On December 30, 2003, Bishop received additional calls from DeSilva, Sr., who was extremely upset that he had not received the marijuana.  During the calls, DeSilva, Sr. again threatened the undercover agent and his family.

On October 17, 2003, Joshua Carlson was stopped by police in a vehicle with Jose Garcia-Martinez.  Approximately one pound of marijuana was found in Garcia Martinez's possession.  Garcia-Martinez was delivering the marijuana for the defendant at the time of the traffic stop.

The defendant supplied Terrence Branigan with cocaine during the period March 2003 and November 2003.  On some occasions, Branigan would pool his money with Devin Muscovalley, who would make the actual purchase from the defendant.   Branigan and his associates thereafter converted the cocaine that he received from the defendant into "crack" before they resold it.

Jose Gomez delivered bulk quantities of cocaine to the defendant from November 2002 through March 2003 in East Moline, Illinois.  The defendant placed the cocaine orders with Jose Baldemar Ramirez, who in turn directed Gomez to deliver the cocaine to the defendant.

- 23 -

As a part of the above-summarized activities, the defendant and his co-conspirators made statements regarding his involvement in committing conspiracy to distribute cocaine and marijuana.  The government expects to offer such statements at trial pursuant to Fed.R.Evid 801(d)(2)(E).  They include those statements documented in the investigative reports and grand jury transcripts that were made available to defendant's counsel as Jencks materials.

**WHEREFORE**, the above-summarized facts demonstrate that the defendant was a member of a conspiracy to distribute cocaine and marijuana.  Accordingly, the United States hereby gives notice of its intent to present co-conspirator statements against the defendant in the trial of this matter.

Respectfully submitted,

JAN PAUL MILLER
UNITED STATES ATTORNEY


BY:   /s/ Sara L. Darrow_____
SARA L. DARROW
ASSISTANT U.S. ATTORNEY
1830 Second Avenue, Suite 320
Rock Island, Illinois 61201
Telephone (309) 793-5884

## CERTIFICATION OF SERVICE

**I HEREBY CERTIFY** that on October 14, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant:  James Clements, Esq. and Murray Bell, Esq

.

/s/ Sara L. Darrow
Sara L. Darrow
Assistant U.S. Attorney