# United States Court of Appeals

For the Seventh Circuit

Chicago, Illinois 60604

JUDGMENT - WITH ORAL ARGUMENT

CERTIFIED COPY

Date: October 12, 2007

BEFORE:          Honorable FRANK H. EASTERBROOK, Chief Judge

                 Honorable ILANA DIAMOND ROVNER, Circuit Judge

                 Honorable DIANE S. SYKES, Circuit Judge

No. 06-1451

UNITED STATES OF AMERICA,
          Plaintiff - Appellee
   v.

JOHNNY J. DESILVA, JR.,
          Defendant - Appellant


Appeal from the United States District Court for the
Central District of Illinois
No. 04 CR 40080, Joe Billy McDade, Judge


        The judgment of the District Court is AFFIRMED, in accordance with
   the decision of this court entered on this date.


(1061-110393)

A True Copy:
Teste:
Clerk of the United States
Court of Appeals for the
Seventh Circuit

CERTIFIED COPY

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1451

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

JOHNNY J. DESILVA, JR.,

    *Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 40080—**Joe Billy McDade**, *Judge.*

ARGUED FEBRUARY 5, 2007—DECIDED OCTOBER 12, 2007

Before EASTERBROOK, *Chief Judge,* and ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* On October 25, 2005, a jury found Johnny Joe DeSilva, Jr., guilty as to each of the five counts against him. Count I charged DeSilva with participating in a conspiracy among members of the Latin Kings street gang in the Quad Cities area of Illinois and Iowa to distribute cocaine and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Count II charged him with attempted aggravated battery in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(6) and 18 U.S.C. § 2. Specifically, that Count alleged that he attempted to commit assault with a dangerous weapon for the purpose of maintaining or

increasing his position in the Latin Kings by causing another person to discharge a firearm. DeSilva was charged in Count III with vicarious use and carrying of a firearm in relation to that incident in Count II, in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2. Counts IV and V alleged that DeSilva communicated interstate threats to kidnap and to injure, with the intent to recover 30 pounds of marijuana that had been retained by DEA agents in an undercover operation, in violation of 18 U.S.C. § 875(b). After the conviction, DeSilva filed a motion to vacate the convictions under Counts II and III under Fed. R. Crim. P. 29, which the district court denied. The court then sentenced him to imprisonment for 360 months on Count I, 36 months on Count II, and 240 months on Counts IV and V, all to be served concurrently. The court also sentenced him to 120 months on Count III, to be served consecutively pursuant to 18 U.S.C. § 924(c). Finally, the court imposed a sentence of 18 months consecutive to Count I for violation of supervised release.

The evidence at trial demonstrated that DeSilva was a Regional Enforcer for the Latin Kings in the Quad Cities, a position that placed him as the highest ranking member of the Latin Kings in that area. As a Regional Enforcer, he was responsible for security for the region, which included responding to external threats or slights from rival gangs, as well as internal discipline. The testimony detailed the hierarchical structure of the gang, with members required to follow orders of those holding higher ranks, and with discipline meted out to those who failed to comply. At the local level, the gang members were led by the Inca and the Casique as the first and second in command, and a Chapter Enforcer. The Regional Enforcer position was above those positions in the hierarchy, with responsibility for the whole Quad Cities region. For a member to progress within the organization, he had to demonstrate that he was never weak. The testimony at

trial also described the frequent clashes with rival gangs, including the Low Riders, the Surenos and the Outlaw Gangsters. One example of such an incident was a 1995 drive-by shooting in which DeSilva drove the vehicle while fellow Latin Kings fired shots into a group of Low Riders in a grade school parking lot, hitting one victim in the face. Another incident occurred in 2001 in response to the beating of a Latin Kings member by a rival gang, in which the chapter enforcer authorized and participated in a drive-by shooting of the rival member's house.

Evidence was also introduced as to an incident on July 3, 2002. On that date, Manuel Garcia, a member of the Latin Kings, was attending a barbecue in his sister's yard when he spotted DeSilva's vehicle pull into an adjacent alley, followed by two other vehicles. Some members of the rival Outlaw Gangsters gang jumped out of those vehicles and ran toward DeSilva to "get him." Garcia ran toward DeSilva, and DeSilva reentered his vehicle and drove up the alley towards Garcia. As he neared Garcia, DeSilva ordered him to "Go light 'em up at the light," which Garcia understood as an order to shoot at the Outlaw Gangsters. Garcia retrieved a gun that he had stored under a garbage can in the alley, and ran through an adjoining yard, catching up with the cars at a traffic light. He fired one shot at the windshield in an attempt to hit the driver, but the gun jammed when he tried to fire a second time. He then ran back into the alley and placed the gun in its previous location. Garcia testified that he was required to follow the order of DeSilva and that he probably would have been beaten had he failed to comply. The Outlaw Gangsters returned that evening and tried to shoot Garcia, but he ran and grabbed another gun and fired at them as they sped away.

Finally, the testimony established that the Latin Kings were involved in a multiple-kilo cocaine and marijuana drug distribution network in the Quad Cities, which

DeSilva coordinated. The drug conspiracy involved other suppliers and distributors, included cross-country transportation of drugs, and involved the use of guns. We need not elaborate on that conspiracy, however, because DeSilva raises no challenges to the drug conspiracy conviction.

DeSilva first argues that there was insufficient evidence to convict him for committing a violent crime in aid of racketeering activity, and for the related firearms charge. Where the sufficiency of the evidence to support a conviction is challenged, we review the evidence in the light most favorable to the verdict, and will reverse only if no rational trier of fact could have found him guilty of the charges beyond a reasonable doubt. *United States v. Ratliff-White*, 493 F.3d 812, 817 (7th Cir. 2007).

DeSilva focuses his challenge on the evidence relating to his intent in instructing Garcia to take action against the Outlaw Gangster members. He argues that no evidence was introduced as to his motive in telling Garcia to "light up" the gang members, and that the jury therefore had insufficient evidence from which to find that he acted to maintain or increase his position in the Latin Kings. DeSilva further postulates that Garcia's motive may have been to increase Garcia's own position in the Latin Kings gang, but that there was no direct evidence to indicate that DeSilva ordered the shooting to maintain or increase DeSilva's position in the Latin Kings.

The motive requirement of the offense at issue here is met if the jury could properly infer that "the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006); *United States v. Smith*, 413 F.3d 1253, 1277-78 (10th Cir. 2005). There was sufficient evidence to meet that standard here. DeSilva was the Regional Enforcer for the Latin Kings, and it was his duty to ensure internal and external security. The trial testimony included examples of actions taken by Regional Enforcers against Latin Kings members who failed to fulfill their obligations in the Latin Kings, and against rival gang members who engaged in hostile or "disrespectful" actions toward the Latin Kings. The testimony showed that DeSilva was expected to respond, or to authorize responses, to threats from other gangs, including actions by other gangs that showed disrespect for the Latin Kings, or that encroached upon the Latin Kings territory. The testimony further established that the Outlaw Gangsters pulled into the alley behind DeSilva, that they outnumbered him substantially, and that they began approaching him. They retreated to their cars when Garcia approached. A jury could find that the actions of the Outlaw Gangsters were either a direct threat to DeSilva as a Latin Kings member, or at least actions demonstrating disrespect, and that DeSilva would have been expected to respond to that in his position as Regional Enforcer. There was sufficient evidence for a jury to find that DeSilva responded to that hostile action by a rival gang by ordering Garcia to "light 'em up," in order to maintain his position as Regional Enforcer in the Latin Kings. Although it is possible to speculate as to alternative motives for the order, as DeSilva would have us do, that is not our role. The only question is whether a rational jury could have found that motive beyond a reasonable doubt, and we agree with the district court that the evidence was sufficient to support that determination.

DeSilva next argues that his action in ordering Garcia to "light 'em up" was not a substantial step towards commission of the offense of aggravated battery, and therefore that he could not be guilty of attempted aggravated battery. He bases this argument on the Illinois attempt statute, which states that a person commits an

attempt when "with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a).

DeSilva's argument as to whether DeSilva's actions constituted attempted aggravated battery under Illinois law is misplaced. The issue here is whether DeSilva violated 18 U.S.C. § 1959 and 18 U.S.C. § 2, which require, in relevant part, proof that DeSilva committed (or commanded or caused the commission of) an assault with a dangerous weapon in violation of a state statute, namely the Illinois offense of attempted aggravated battery with a firearm. Therefore, DeSilva need not have discharged a firearm to cause injury to another, or have attempted to do so. Instead, the question is whether DeSilva willfully caused Garcia to do so. There is no question that Garcia at a minimum took a substantial step towards committing aggravated battery with a firearm, in that he intentionally discharged a firearm at the individuals in the car with the intent to cause injury. It does not matter that Garcia, rather than DeSilva, fired the gun, because it was done on DeSilva's order, and that is sufficient for liability under the federal statutes at issue here. Because we reject DeSilva's challenge to the conviction for attempted aggravated battery, his challenge to the firearms charge in Count III fails as well, as it was premised entirely on reversal of the attempted aggravated battery conviction.

DeSilva also challenges the district court's application of two sentence enhancements. He argues that the court erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for carrying a firearm, in sentencing him under Count I for the drug conspiracy. DeSilva asserts that the enhancement constituted double punishment for the same conduct because he was also sentenced for violation of 18 U.S.C. § 924(c), which punishes those who use or carry a firearm "during and in relation to any

crime of violence or drug trafficking crime." In addition, DeSilva argues that the district court erred in imposing a 4-level enhancement under U.S.S.G. § 3B1.1 for being an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." DeSilva argues that the district court failed to specifically identify the participants for whom he was a leader or organizer.

The government persuasively argues that those challenges to the enhancements have been waived. DeSilva objected generally to allegations of criminal conduct in the PSR. He also specifically objected to the enhancements for firearms and for role in the offense as violative of the principles of *Apprendi*. Neither of the objections raised in this court, however, were made at that time. That alone would indicate forfeiture, rather than waiver. The district court, however, asked DeSilva and his attorney whether they had any other objections, and they both affirmatively represented that there were no other objections to the PSR recommendation.

That is similar to the situation presented to this court in *United States v. Walton*, 255 F.3d 437 (7th Cir. 2001). In *Walton*, the defendant objected to an enhancement which prescribed a four-level increase for the offense of receiving child pornography "if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence." U.S.S.G. § 2G2.2(b)(3). Walton objected to the enhancement in the district court on the ground that the guidelines provision applied only if the defendant received more than one qualifying image. On appeal, he sought to argue that the enhancement was improper because the district court failed to make a finding on the record that the image in question depicted sadistic, masochistic or violent conduct. *Id.* at 441-42. We noted in *Walton* that the defense attorney, when asked by the district court whether that was the sole objection

to that enhancement, declared that the objection made was "the whole issue." *Id.* at 442. Because Walton's counsel disavowed any other objections, we held that he had waived any other objections. We noted that the district court's failure to develop the factual record with respect to the nature of the photographs was a direct result of defense counsel's implication that he was not contesting that factual basis. *Id.*

That is similar to this case, in that DeSilva asserts that the district court failed to identify the participants in the role in the offense enhancement, yet defense counsel clearly indicated that he was not making any such challenge to that enhancement. "A party may not by his own action lull the court into believing that an express finding is unnecessary and then object when it makes no such finding." *Id.*

Even if we were to find that the arguments were merely forfeited, DeSilva would fare no better. The firearms enhancement did not enact a double punishment because it reflected the use of a firearm that was different from the firearm use relied upon for the § 924(c) count. The § 924(c) charge was based on testimony establishing the presence of a firearm in numerous drug-related transactions, whereas the firearms enhancement related to the incident in which DeSilva ordered Garcia to shoot at the gang members who had followed him into the alley. Therefore, he is not being punished twice for the same conduct, but is being held accountable for separate conduct. The challenge to the role in the offense enhancement is also unavailing as the record provides overwhelming evidence that DeSilva, as Regional Enforcer for the Latin Kings, was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

DeSilva's final challenge relates to remarks made by the prosecutor in opening and closing arguments. Defense

counsel did not object to any of those statements when they were made, and therefore we review his claim for plain error. Under that standard, DeSilva has the burden of demonstrating that the prosecutor's remarks were improper, that they denied him a fair trial, and that the outcome of the proceedings would have been different absent the improper statements. *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003). In the course of opening arguments, the prosecutor referred to a 1995 drive-by shooting in which DeSilva was involved, targeting a rival gang. DeSilva argues that statement was an impermissible reference to prior bad acts in violation of Fed. R. Crim. P. 404(b). DeSilva's trial counsel, however, stipulated to the admission of the 1995 incident at trial. The 1995 incident was relevant as an act in furtherance of the racketeering enterprise, to establish the existence of the Latin Kings as a RICO enterprise, its nature, and DeSilva's membership in it. DeSilva acknowledges that evidence of a defendant's prior bad acts may be admitted for such limited purposes in general. *United States v. James*, 464 F.3d 699, 709-10 (7th Cir. 2006); *United States v. Hernandez*, 330 F.3d 964, 971 (7th Cir. 2003); *United States v. Diaz*, 176 F.3d 52, 79, 103 (2d Cir. 1999). Given the stipulation as to its admissibility, DeSilva has no basis for challenging the government's reference to it in opening statements. DeSilva attempts to dismiss that stipulation as occurring after the damage had been done, when an objection could not "unring the bell." That characterization of the stipulation is not only unsupported in the record, it is nonsensical. Because opening statements are not evidence, an objection could have prevented the jury from considering it at all, whereas the stipulation placed it before the jury as evidence that it could properly consider. DeSilva has failed to demonstrate error in the government's opening statement.

The government's statements in closing arguments are more troubling. The first challenged statement, in its context, came during closing arguments, and the second was voiced during rebuttal:

> Consider and carefully weigh the evidence. Evaluate it using your own common sense and reasoning. When you do that, and when you apply the facts to the law, you will know in your minds and your heart that the defendant is guilty. And when you reach that conclusion, I ask you, on behalf of the people of the United States, do not flinch, do your duty. Knock this Latin King off his throne by returning verdicts of guilty. *Send the message to the Latin Kings and every other gang in this community that the streets of the Quad Cities are ruled by a power stronger than the gangs, and that is they are ruled by the law, not by drug dealers and not by the leaders of violent gangs like the defendant.*
>
> You just can't ignore the evidence in this case, One thing I agree upon with defense counsel is that folks like you make the system work. By applying the law to the facts in this case and returning a guilty verdict, what you are doing is protecting something. *You're protecting this community from drug dealers like the defendant and gang leaders like the defendant that inflict violence upon this community.*

The defendant objects to the italicized portions of the closing and rebuttal arguments, arguing that it improperly invites the jury to convict the defendant in order to punish or deter other persons not on trial. The government—wisely—does not defend the comments as proper. Similar statements have consistently been found improper. *United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005); *United States v. Badger*, 983 F.2d 1443, 1456 (7th Cir. 1993); *United States v. Solivan*, 937

F.2d 1146 (6th Cir. 1991). Instead, the government contends that those isolated statements did not rise to the level of plain error.

Once a statement, considered in isolation, is deemed improper, we consider whether those statements, taken in the context of the record as a whole, deprive the defendant of a fair trial. *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003). In making that determination, we consider: (1) the nature and seriousness of the statement; (2) whether the statement was invited by the conduct of defense counsel; (3) whether the district court sufficiently instructed the jury to disregard such statement; (4) whether the defense could counter the improper statement through rebuttal; and (5) whether the weight of the evidence was against the defendant. *Id.* Because no objection was made to those remarks when made, DeSilva additionally needs to meet the plain error standard which requires him "to 'establish not only that the remarks denied him a fair trial but also that the outcome of the proceedings would have been different absent the remarks.'" *Id.*, quoting *United States v. Anderson*, 303 F.3d 847, 854 (7th Cir. 2002) and *United States v. Durham*, 211 F.3d 437, 442 (7th Cir. 2000). That added burden ultimately dooms this claim.

The evidence was overwhelming for most of the Counts, although more limited as to Counts II and III relating to the incident in the alley. Other factors, however, are less favorable to DeSilva. The improper comments were relatively brief and isolated, defense counsel had an opportunity to respond in closing argument, and the context ameliorates their impact. Although the comments could be construed as inviting a determination of guilt based on community-wide deterrence, the prosecutor specifically directed the jury to consider the evidence, weigh the law and make its determination based on that law. Once a determination of guilt was made based on that

12                              No. 06-1451

law and evidence, the prosecutor urged the jury to abide by its duty and return that verdict of guilt and thus send the message to the community. That is slightly less prejudicial than a statement that implied the guilt determination itself should be based on a desire to send a message, although, as the government has conceded, it is still improper.

Moreover, the court instructed the jury that it must decide guilt or innocence based on the evidence, that evidence consisted only of testimony of witnesses, exhibits admitted into evidence, and stipulations, and that opening and closing statements were not evidence. The court also instructed the jurors not to allow sympathy, prejudice, fear or public opinion to influence them. Therefore, both the prosecutor's statement in context and the court's instructions alerted the jury to decide guilt or innocence based solely on the evidence and the law. Although the problematic statements about sending a message are improper because a jury could consider that in deciding guilt, the preceding statements by the prosecutor to the contrary, and the court's instructions, significantly ameliorated that potential danger. Although an argument can certainly be made that the error was significant enough to impact the fairness of the trial, taking the record as a whole we cannot conclude that he has met the difficult plain error burden of demonstrating that the outcome of the proceedings would have been different absent the remarks.

The decision of the district court is AFFIRMED.

No. 06-1451                                                          13

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—10-12-07