## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-cr-40080 |
| | ) | |
| JOHNNY JOE DESILVA, JR., a/k/a Loco, | ) | |
| a/k/a JJ, a/k/a Gordo, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## THE UNITED STATES OF AMERICA'S RESPONSE TO
## DEFENDANT'S MOTION FOR SENTENCE REDUCTION

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, and Jennifer Mathew, Assistant United States Attorney, and hereby requests that this Court deny the defendant's motion for compassionate release because: (1) he has failed either to exhaust his BOP administrative remedies or wait 30 days after filing his request to BOP before filing the instant motion and (2) the defendant's release would present a danger to the community under 18 U.S.C. 3142(g) and is unsupported by the relevant 18 U.S.C. 3553(a) sentencing factors.

1

# I.     Factual Background

## A.     Defendant's Background and Procedural History

The defendant, Johnny Joe DeSilva ("DeSilva"), is the forty-five-year-old founder of the Quad Cities chapter of the Latin Kings street gang. PSR at 2; ¶ 26. In January of 2005, a federal grand jury returned a superseding indictment, charging DeSilva with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846 (count one), violent crime in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a) and 2 (count two), using or carrying a firearm during and in relation to the VICAR offense, in violation of 18 U.S.C. §§ 924(c) and 2 (count three), and communicating interstate threats to kidnap or injure, in violation of 18 U.S.C. § 875(b) (counts four and five). R. 20.

After a jury trial, the defendant was convicted of all counts and sentenced to an aggregate sentence of 480 months in prison. R. 80, 90, 97. That sentence was comprised of concurrent sentences of 360, 36, and 240 months on the conspiracy, VICAR, and threat counts and a consecutive sentence of 120 months on the § 924(c) count. R. 97 at 3. At the time he committed the instant offense, DeSilva had been on supervision in the Central District of Illinois for less than two years, after serving a six-month sentence for conspiracy to commit bank fraud and bank fraud. PSR ¶¶ 137, 139, 140.

Effective November 1, 2014, the Sentencing Commission retroactively amended the Sentencing Guidelines by reducing the guideline ranges for many drug-related offenses. *See* USSG, supp. to app. C, amend. 782 and 788 (2016). Specifically, Amendment 782

lowered the base offense levels for most drug offenses by reducing the drug quantity table in USSG § 2D1.1 by two levels. *See id.*, amend. 782.

Based on Amendment 782, in  February of 2017, the defendant filed a counseled motion under 18 U.S.C. § 3582(c)(2) asking the district court reduce his sentence on count one of the indictment from 360 months to 292 months in prison. R. 132, 132-1. DeSilva and the government agreed that he was "technically eligible" to receive a reduction in his sentence on count one because Amendment 782 reduced his total offense level from 40 to 38 and, correspondingly, his Guidelines range from 360 months to life to 292 to 365 months. R. 132 at ¶¶ 4, 6; R. 149 at 12-13. The government, however, opposed any reduction because of public safety considerations. R. 149 at 2, 13-20. *See* USSG § 1B1.10, cmt. n.1(B)(ii).

Before ruling on the defendant's motion, the district court held two hearings, the first in March 2017 and the second the following month. *See generally* R. 149, 150. At the conclusion of the first hearing, the Court set the matter over for an evidentiary hearing on "whether or not the defendant is a public safety risk." R. 149 at 39. The Court explained that, when it sentenced the defendant originally, the record showed he was a "member of the Latin Kings gang with power as an enforcer to commit violent acts of conduct against rival gang members personally and/or to order other gang members to do so." *Id.* at 30. The Court expressed its "great interest in knowing whether or not the defendant has renounced his gang membership in the . . . street gang," and if not, "what position he holds." *Id.* at 39.

At the next month's hearing, the defendant was present in person when the government called as a witness a Bureau of Prisons employee who works in the Bureau's special investigative services (SIS) division. *See* R. 150 at 12-19. The SIS employee testified that DeSilva is still a member of the Latin Kings and has an "influential role" within the gang at the prison where he is presently incarcerated. *Id.* at 14-17. The employee testified that, although there is a process within the Bureau for prisoners to renounce their gang membership, DeSilva has never initiated that process. *Id.* at 17-18.

After hearing that testimony and the arguments of counsel, the Court reduced the defendant's sentence on count one to 324 months in prison. R. 150 at 64. In deciding to grant the defendant's motion, but not to award the maximum possible reduction allowed by USSG § 1B1.10(b)(2)(A), the Court weighed the defendant's violent gang history and continued membership in the Latin Kings against his positive prison record. *Id.* at 58-65. In reducing DeSilva's offense level by only one level, instead of the maximum of two levels, and imposing an amended sentence at the low end of that new range (324-405 months), the district court explained it was giving "equal weight" to the danger the defendant poses to the public and to his positive post-sentencing conduct. *Id.* at 64. *See* USSG § 1B1.10, cmt. n.1(B)(ii) and (iii) (directing district courts "shall" consider public safety and "may" consider post-sentencing conduct in determining whether reduction is warranted and extent of reduction). The Court's ruling was later affirmed on appeal. *See United States v. DeSilva*, 706 Fed. Appx. 330, 331 (7th Cir. 2017).

On May 21, 2020, the defendant wrote to the warden at FCI Elkton requesting compassionate release, predicated on assorted health issues, including diabetes and having been infected with COVID-19. In his correspondence, the defendant alleges he previously requested compassionate release via institutional mail on May 3, 2020. The only documentation of requested relief provided to the government by the Bureau of Prisons is the May 21, 2020 correspondence. *See* Gov. Exhibit 1 at 2. On May 26, 2020, the Health Services Administrator at FCI Elkton prepared a memorandum for the warden advising DeSilva, "does not meet the medical criteria for compassionate release/reduction in sentence under the revised policy." *Id*. at 3. On May 27, 2020, a letter was authored from the warden's office to the defendant explaining that his reduction in sentence request was being denied. *Id.* at 1. There is no further documentation of administrative remedies sought by the defendant.

On June 6, 2020, the defendant filed a counseled motion with this Court requesting that the defendant's sentence be reduced pursuant to Title 18, United States Code, Section 3582(c)(1)(A)(i). The defendant's motion alleges he has chronic severe obesity, diabetes, and hypertension and suffers from other health complications as a result of being infected with COVID-19. *See generally* R. 163.

### B. The Defendant in BOP

The defendant's BOP disciplinary record reflects that he has no disciplinary violations during his term of imprisonment. *See* Gov. Exhibit 3. He is currently housed at FCI Elkton.

The defendant is a COVID-19 survivor. He was admitted to the East Liverpool City Hospital in East Liverpool, Ohio on April 2, 2020, presenting in respiratory failure and requiring intubation. *See* Exhibit 2, 2020 BOP Medical Records, attached, p. 202. At East Liverpool hospital, DeSilva was given a rapid-test and tested positive for COVID-19. This was further confirmed with PCR findings. *Id.* at 230. At the time of hospitalization his documented health issues consisted of gastroesophageal reflux disease, essential hypertension, hypothyroidism, chronic severe obesity, generalized anxiety disorder, and type 2 diabetes mellitus. *Id.* at 199. During his hospitalization the defendant was intubated for a period of sixteen days and experienced acute respiratory distress syndrome and septic shock. *Id.* at 230. At the time of discharge, though he complained of pain in his right foot, he was stable, able to ambulate, and manage his activities of daily living without difficulty. *Id.*

On May 20, 2020, DeSilva was again hospitalized, complaining of lower leg swelling and a diabetic foot wound. While hospitalized, a chest x-ray showed suspected mild congestive heart failure, possibly residual effects from being previously placed on a ventilator. *See* Exhibit 2 at 173-74. The treating physician did not suspect he had been re-infected with COVID-19. *Id.*

As of the date of the filing of this response, at FCI Elkton, there are 40 known cases of COVID-19 among inmates and 7 among staff. 9 inmates have died and 565 inmates have recovered. There have been 0 staff deaths and 46 staff members who have

recovered.[1]  Since the defendant's filing, 417 inmates have recovered and the number of inmates testing positive has decreased by 384. There have been no new deaths. *Id., see also* R. 163 at 6.

### C.      The BOP's Response To The COVID-19 Pandemic

As this Court is well aware, COVID-19 is an illness that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_ update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/ pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease

---

[1] *See* BOP: COVID-19 Update, https://www.bop.gov/coronavirus/ (last accessed June 15, 2020).

Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

### 1. The Attorney General's March 26, 2020 Memorandum

On March 26, 2020, the Attorney General issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020 Memorandum) to ensure that, in light of the COVID-19 pandemic, BOP uses home confinement, where appropriate, to protect the health and safety of BOP personnel and people in BOP's custody. Pursuant to the March 26, 2020 Memorandum, BOP is prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.

BOP's statutory authority to transfer prisoners to home confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. BOP's policy and procedures regarding home confinement are outlined in BOP Program Statement 7320.01, Home Confinement and BOP Operations Memorandum, *Home Confinement under the First Step Act*, both of which are available on www.bop.gov via the Resources tab. Both statutes set forth certain limitations with respect to the BOP's transfer authority. *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. Pursuant to the Attorney General's directives, however, in light of the COVID-19 pandemic, BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention (CDC), to

determine which inmates are suitable for home confinement. Since the release of the Attorney General's original Memorandum dated March 26, 2020, BOP is prioritizing transfers to home confinement of all suitable inmates as an appropriate response to the COVID-19 pandemic. It was noted in the March 26, 2020, Memorandum, however, that many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.

In assessing whether home confinement should be granted pursuant to the March 26, 2020, Memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

a. The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment;

e. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

f. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex

offenses, will render an inmate ineligible for home confinement. Other serious offenses weigh heavily against consideration for home confinement.

In addition to setting forth these factors, the March 26, 2020, Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement. The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

Moreover, the March 26, 2020, Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

### 2. The Attorney General's April 3, 2020, Memorandum

The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency

conditions that are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the Bureau of Prisons (April 3, 2020, Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determines that COVID-19 is materially affecting operations.

The April 3, 2020, Memorandum specifically stated that BOP should move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the BOP continues to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.

The April 3, 2020, Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020, Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.

For inmates deemed suitable candidates for home confinement, the April 3, 2020, Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility. The April 3, 2020, Memorandum further authorized BOP to, in appropriate cases,

require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate is being transferred rather than in the BOP facility from which the inmate is being transferred. The assessment of all inmates remains guided by the factors in the March 26, 2020, Memorandum.

The April 3, 2020, Memorandum also recognized that the BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

Lastly, the April 3, 2020, Memorandum stated that it is essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

### 3. BOP's Implementation of the March 26, 2020, and the April 3, 2020, Memoranda

BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country. BOP is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program. BOP is then processing those inmates for transfer as expeditiously as possible.

BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives. BOP has increased home confinement since March 2020, and is continuing to aggressively screen inmates for home confinement. Since the March 26, 2020, Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, BOP has placed over 2,800 additional inmates on home confinement. *See* www.bop.gov/coronavirus.

Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

It should be noted that for public safety reasons, in accordance with the March 26, 2020, Memorandum, and to ensure BOP is deploying its limited resources in the most effective manner, BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

In addition, and to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences. While these priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences. As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration.

If the incarcerated individual does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies.

### 4. Measures to Protect Inmate and Staff Safety

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. These steps include, but are not limited to the following:

    a.    BOP has implemented its Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its

facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions;

b.     All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved;

c.     Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer;

d.     Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.,* medical or mental health care, religious, *etc.*) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors;

e.     Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors;

f.     Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

## II.     Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. The Court's review of a request under § 3582 takes place in two phases. First, the Court must consider whether the Defendant has exhausted his administrative remedies. Second, if the Court determines that the exhaustion requirement[2] has been met, the Court may go on to perform a substantive analysis to determine if the Defendant has proven extraordinary and compelling reasons exist to reduce his sentence and that such a reduction is consistent with the Sentencing Commission's applicable policy statements.

### A.  Exhaustion Requirement

Before filing a motion for reduction with this Court, the Defendant was required to first request that BOP file such a motion on his behalf. § 3582(c)(1)(A). A court may grant a motion brought by a defendant directly only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

The exhaustion requirement is mandatory and must be enforced by the Court. As the Third Circuit recently confirmed, where 30 days have not passed following

---

[2] Although the Government uses the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Likewise, the Southern District of Indiana recently ruled that district courts do not have the "power to ignore the administrative exhaustion requirement." *United States v. Albertson*, No. 1:16-cr-00250-TWP-MJD, 2020 WL 1815853, at *2 (S.D. Ind. Apr. 8, 2020).[3]

The mandatory nature of the exhaustion requirement flows naturally from the established rule that "'a judgment of conviction that includes [a sentence of

---

[3] A handful of courts, mostly in the Second Circuit, have agreed in recent weeks that the exhaustion requirement may be negated. *See e.g.*, *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (11 days remaining on sentence); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (26 days remaining on sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020); *United States v. Paciullo*, 2020 WL 1862252, at *2 (S.D.N.Y. Apr. 14, 2020) (court strikes a "compromise" and allows BOP 20 days); *United States v. Russo*, 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020).

A number of other district courts in the Second Circuit disagree, while virtually every other district court in the country to consider this issue in a reported decision agrees with *Raia* and the Government that the 30-day requirement must be enforced. *See, e.g.*, *United States v. Gillis*, 2020 WL 1846792 (C.D. Cal. Apr. 9, 2020); *United States v. Meron*, 2020 WL 1873900 (E.D. Cal. Apr. 15, 2020); *United States v. Hembry*, 2020 WL 1821930 (N.D. Cal. Apr. 10, 2020); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020); *United States v. Perry*, 2020 WL 1676773 (D. Colo. Apr. 3, 2020); *United States v. Zywotko*, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020); *United States v. Read-Forbes*, 2020 WL 1888856 (D. Kan. Apr. 16, 2020); *United States v. Boyles*, 2020 WL 1819887 (D. Kan. Apr. 10, 2020); *United States v. Carter*, 2020 WL 1808288 (S.D. Ind. Apr. 9, 2020); *United States v. Hofmeister*, 2020 WL 1811365, at *3 (E.D. Ky. Apr. 9, 2020) (explaining that the rule is jurisdictional, and perhaps even more necessary during COVID-19 crisis); *United States v. Reeves*, 2020 WL 1816496 (W.D. La. Apr. 9, 2020); *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (extensive analysis, concluding, "The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Johnson*, 2020 WL 1663360, at *3-*6 (D. Md. Apr. 3, 2020) (concluding in lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Underwood*, 2020 WL 1820092 (D. Md. Apr. 10, 2020); *United States v. Carden*, 2020 WL 1873951 (D. Md. Apr. 15, 2020); *United States v. Alam*, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020); *United States*

imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). Finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g., United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court

---

*v. Mathews*, 2020 WL 1873360 (E.D. Mich. Apr. 15, 2020); *United States v. Annis*, 2020 WL 1812421, at *2 (D. Minn. Apr. 9, 2020) (Tunheim, C.J.) ("There is no question that COVID-19 is a cause for alarm, and the Court does not fault Annis's concerns, given his health conditions. However, given the scale of the COVID-19 pandemic and the complexity of the situation in federal institutions, it is even more important that Annis first attempt to use BOP's administrative remedies."); *United States v. Gardner*, 2020 WL 1867034 (D. Minn. Apr. 14, 2020); *United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020); *United States v. Ogarro*, 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) (lengthy analysis, stating, "In fact, section 3582(c)'s exhaustion proscription is clear as day."); *United States v. Pereyra-Polanco*, 2020 WL 1862639 (S.D.N.Y. Apr. 14, 2020); *United States v. Roberts*, 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 2020 WL 1673253 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, 2020 WL 1674137 (S.D.N.Y. Apr. 6, 2020); *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (follows "vast majority" of courts); *United States v. Schultz*, 2020 WL 1872352 (W.D.N.Y. Apr. 15, 2020); *United States v. Allen*, 2020 WL 1878774 (N.D. Ohio Apr. 15, 2020); *United States v. Simmons*, 2020 WL 1903281 (D. Or. Apr. 17, 2020); *United States v. Holden*, 2020 WL 1673440 (D. Or. Apr. 6, 2020) (very extensive discussion); *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (cites numerous cases in agreement); *United States v. Petrossi*, 2020 WL 1865758 (M.D. Pa. Apr. 14, 2020); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020); *United States v. Fuller*, 2020 WL 1847751 (W.D. Wash. Apr. 13, 2020); *United States v. Carver*, 2020 WL 1604968 (E.D. Wash. Apr., 1, 2020); *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense. The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.").

does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (Internal quotation marks omitted). In this case, the Court's authorization requires a defendant's administrative exhaustion.

There has been some debate about whether the language of Section 3582(c) is "jurisdictional" or a "mandatory claim processing rule." In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). That said, the difference between the clause being "jurisdictional" or a "mandatory claim processing rule" is ultimately academic. Indeed, even those courts which, like the Seventh Circuit, have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g., United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original). The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused.

Congress had good reason to require administrative exhaustion prior to a court's consideration of a motion for compassionate release, BOP's expertise and ability to review the circumstances of each inmate's individual position. BOP conducts an extensive assessment for compassionate release requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures

for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the procedures reflect, BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. As a result, BOP's assessment will always be of value to the parties and the Court.

The value of BOP's assessment is especially true during the current crisis. BOP must balance a host of considerations in deciding whether to recommend a reduction in an inmate's sentence—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history, as well as the more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. *See also United States v. McCann*, 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

Accordingly, this Court cannot grant the Motion without the Defendant establishing two things. First, that he has presented his request for compassionate release

to BOP. Second, that he has fully exhausted his administrative remedies or that more than 30 days has passed since BOP received his request for compassionate release. As noted below, the Defendant has failed to wait 30 days or completely exhaust his BOP administrative remedies before filing.

### B. Substantive Analysis

If the exhaustion requirement is met, a court may reduce a defendant's term of imprisonment only if it finds, after substantively reviewing his motion, that he has demonstrated a reduction is warranted because of extraordinary and compelling circumstances. The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[4] It is important to note that as the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

---

[4] The policy statement refers only to motions filed by BOP Director because it was last amended on November 1, 2018, prior to the passage of the First Step Act on December 21, 2018. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; cf. 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, n.1(A)(ii).

Finally, the application notes also set out a statutory prohibition on what does ***not*** qualify as "extraordinary and compelling reasons" under the statute: "Pursuant to 28 U.S.C. 994(t), rehabilitation of the defendant is not, but itself, and extraordinary and compelling reason for purposes of this policy statement." USSG § 1B1.13, n.3.

## III. Argument

### A. The Defendant's Motion Must Be Denied Because He Failed to Exhaust His BOP Administrative Remedies and Filed His Motion Less Than 30 Days After His Request Was Received By the Warden.

The defendant's motion fails because he filed his motion without first exhausting his BOP administrative remedies and prior to the expiration of the required 30-day time period. As set forth above, exhaustion is a mandatory step that must be complied with prior to granting compassionate release. Here, the Defendant filed his motion June 6, just 16 days after he submitted his documented request to the warden at FCI Elkton. Although the warden denied that request on May 27, 2020, the defendant has not availed himself of the BOP appeal process, and thus has not exhausted his administrative remedies. Moreover, as of the date of the filing of this response, June 15, 2020, 30 days has not elapsed since the defendant initially filed his request with BOP.

Because the Defendant failed to comply with either administrative exhaustion or the 30-day time period, his motion must be denied.

### B. The Applicable 18 U.S.C. § 3553(a) Sentencing Factors and Policy Statement Weigh Against Release.

The United States concedes that the defendant's diabetes and morbid obesity, conditions the Centers for Disease Control has concluded may pose a higher risk for COVID-19 complications, when combined with the ongoing pandemic, may constitute "extraordinary and compelling reasons," for compassionate relief eligibility under the

statute.[5] This is because, with current available epidemiological evidence, the defendant's chronic medical conditions may present "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). Though the paucity of evidence currently surrounding the COVID-19 virus, coupled with the defendant's qualifying health conditions, may make him eligible for relief under the statute, eligibility for relief does not mean the defendant is entitled to relief. Under the applicable policy statement, this Court must still deny a sentence reduction unless it also determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A). Based on the totality of the circumstances, the defendant's motion should be denied.

At the times relevant to the charges in this case, the Quad Cities chapter of the Latin Kings was comprised of sixty to seventy members. PSR ¶ 26. As a "Regional Enforcer," DeSilva was the highest-ranking member of the Latin Kings in the Quad Cities and was responsible for security for the entire region. *United States v. DeSilva*, 505 F.3d 711, 714 (7th Cir. 2007). On July 3, 2002, DeSilva directed a lower-level Latin Kings member to "go

---

[5] *See* COVID-19, Frequently Asked Questions, Transmission, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last accessed June 14, 2020) ("Can people who recover from COVID-19 be re-infected with SARS-CoV-2? The immune response, including duration of immunity, to SARS-CoV-2 infection is not yet understood. Patients with MERS-CoV are unlikely to be re-infected shortly after they recover, but it is not yet known whether similar immune protection will be observed for patients with COVID-19.").

light . . . up" members of a rival gang. PSR ¶ 80. The junior gang member followed DeSilva's command by grabbing a gun and firing a shot at the windshield of a car in which the rival gang members were riding. PSR ¶ 80, *DeSilva*, 505 F.3d at 715.

The defendant's criminal conduct and history also included other acts of violence that he committed or otherwise aided, abetted, or directed. He acted as the driver during, and provided the firearm for, a drive-by shooting (PSR ¶¶ 74-75, 136); he threatened violence against a confidential source, the source's family and friends, and an undercover law enforcement agent (PSR ¶¶ 70, 71); he directed armed Latin Kings members to collect drug debts (*id.* at ¶ 86); and he directed Latin Kings members to "cap" members of a rival gang (*id.* at ¶ 88).

The defendant has a history of facilitating, directing, and commanding violent acts by fellow gang members. R. 150 at 59-60. *See* 18 U.S.C. § 3553(a)(1) (sentence should reflect nature and circumstances of offense and history and characteristics of defendant). Furthermore, although he has the capacity to change, as suggested by his positive record while in prison, he has not availed himself of that opportunity. BOP legal counsel for FCI Elkton advises the defendant continues to hold himself out as the leader and spokesperson of the Latin Kings at FCI Elkton. It is this continued relationship and advancement within the Latin Kings organization that this Court was concerned with at the defendant's §3582 hearing remarking, "If Mr. DeSilva is still committed to the Latin Kings gang, and if he remains so when he is released from custody, the Court has no reason to believe that he will not resume his former activities." R. 150 at 60. *See* 18 U.S.C.

§ 3553(a)(2)(B) and (C) (sentence should afford adequate deterrence and protect the public). The Court further commented:

> When I think of the power to tell someone to commit a violent act against a rival gang member or to shoot up a house where a rival gang member lives with his family or to indiscriminately shoot into a group of people, . . . or to order that done, that's a danger to public safety if you're still a member of that gang, if you still have a leadership role.

R. 150 at 60-61. *See* 18 U.S.C. § 3553(a)(2)(C) (protection of public). The same concerns were echoed by the Seventh Circuit Appellate Court on review.[6] The defendant is still a shot-caller within the Latin Kings and a remains a great threat to the public.

The defendant contends that, "his poor health realistically forecloses the probability of recidivism or a risk to the community." R. 163 at 7. This claim fails to acknowledge the defendant's role in the instant case and his leadership role within the Latin Kings organization. The defendant is a shot-caller, not a shooter. Regardless of his medical conditions or ability to personally engage in violence in the community, he has historically and will continue to direct the violent behavior of others.

---

[6] "On a number of occasions, he directed other members of the Latin Kings to shoot at rival gang members. DeSilva did not himself fire at the rival members, instead commanding others to do so. In that context, his clear record in prison could not be assumed to reflect a change of heart, as opposed to a reflection of his propensity to engage in violent conduct through others rather than by his own hands. Moreover, as noted above, his prior term of imprisonment did not diminish that criminal association; he departed with a higher rank and more power in the gang than when he entered." *United States v. DeSilva*, 706 Fed. Appx. 330, 331–32 (7th Cir. 2017).

The defendant originally received an aggregate 480 month sentence, which was reduced to an aggregate 444 months following his §3582 motion. His projected release date is June 21, 2037, a further reduction in his sentence, would substantially diminish the seriousness of the defendant's crimes and the need to provide just punishment.

Finally, if the defendant were released to supervised release, given the present limitations on home visits and office appointments, the U.S. Probation Office would have very limited ability to supervise him. This is particularly concerning given the defendant's leadership role within the Latin Kings and the specific nature of his offense. When this, along with all the § 3553(a) factors discussed above are also considered, the totality of the circumstances weighs even stronger against the defendant's motion.[7]

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Even if this Court could find extraordinary and compelling circumstances under the statute, the defendant's request should be denied because his history and characteristics establish that his release would be unwarranted under all the § 3553(a) factors.

---

[7] If this Court is nonetheless inclined to grant defendant's motion, the United States requests that prior to release he be held in quarantine for 14 days.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny the defendant's motion for a sentence reduction to time served or home confinement because: (1) he failed to wait 30 days or completely exhaust his BOP administrative remedies before filing the instant motion and (2) the defendant's release would present a danger to the community under 18 U.S.C. 3142(g) and the is unsupported by the relevant 18 U.S.C. 3553(a) sentencing factors.


Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

s/Jennifer L. Mathew
Jennifer L. Mathew
Assistant United States Attorney
1830 Second Avenue, Suite 250
Rock Island, Illinois 61201
Telephone (309) 793-5884


## CERTIFICATION OF SERVICE

**I HEREBY CERTIFY** that on June 15, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

s/Jennifer L. Mathew
Jennifer L. Mathew, Assistant United States Attorney