UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | No 04 CR 40080 |
| ) | Judge Joe Billy McDade |
| ) | |
| JOHNNY DESILVA Jr ) | |
| Defendant. ) | |

**DEFENDANT'S REPLY IN SUPPORT OF
MOTION FOR SENTENCE REDUCTION**

Defendant, Johnny Desilva, by and through his attorney, Renee Woodward, respectfully requests this Honorable Court grant his motion for sentence reduction. In support states the following:

In its Response to Defendant's Motion for Sentence Reduction ("Response"), the Government acknowledges that there may be extraordinary and compelling reasons for Mr. Desilva's release under §3582(c)(1)(A). But seeks the denial of his release due to claims that (1) Mr. Desilva failed to exhaust his administrative remedies or wait 30 days after his request for compassionate release before filing the Motion and (2) that his release would present a danger to the community and is unsupported by §3553 factors.  These claims are wrong.

**I. Administrative Remedies**

The compassionate release statute requires a defendant to first exhaust his administrative remedies with the Bureau of Prison ("BOP"), or wait 30 days in the event the BOP fails to act, whichever is earlier, before petitioning a court. 18 U.S.C. § 3582(c).  Here the government asserts he has not exhausted his remedies and failed to file after 30 days, but this is not the case.

Mr. Desilva waited 30 days before petitioning this Court.  He first requested compassionate release on May 3, 2020.  He never received a response from the warden at FCI

1

Elkton to this request. His motion for sentence reduction was filed on June 6, 2020, over 30 days after the BOP failed to act.[1] Furthermore, he filed a second request for compassionate release on May 22, 2020, and the warden denied that request on May 27, 2020. As of the date of this filing, thirty days have elapsed since Mr. Desilva filed his second request.

Even if he did not exhaust his remedies, under certain circumstances, a court may grant an inmate's requested release even if he has not yet exhausted his claim with the BOP. *See, e.g.*, *United States v. Coles*, No. 18-CR-20254, 2020 WL 1899562, at *4 (E.D. Mich. Apr. 17, 2020); *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) ("The COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver [of the exhaustion requirement]."); *United States v. John McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020).

As both requests for compassionate release occurred over 30 days ago, his motion cannot be denied on this point.

## II. Argument
### A. Extraordinary and Compelling Reasons

The title of Section 603(b) of the First Step Act—"Increasing the Use and Transparency of Compassionate Release"—leaves no doubt as to Congress' intent in modifying §3582(c)(1)(A). Through the First Step Act, Congress sought to allow defendants to directly petition courts for compassionate relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). Now, the Department of Justice ("DOJ") recognizes the unique risks posed to

---

[1] The Government acknowledges that "an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of the request by the warden". Response at 16.

inmates and BOP employees from COVID-19. The DOJ recently adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction for compassionate release. *See also* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Here the Government concedes that Mr. Desilva's "diabetes and morbid obesity, conditions the Center for Disease Control has concluded may pose a higher risk for COVID-19 complications, when combined with the ongoing pandemic, may constitute "extraordinary and compelling reasons," for compassionate relief eligibility under the statute. This is because, with current available epidemiological evidence, the defendant's chronic medical conditions may present "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I)." (Response at 23-24)

But there are other extraordinary and compelling reasons to grant compassionate release. There is a real concern about what could happen to Mr. Desilva if he is re-infected with COVID-19, in light of his medical status and the conditions at FCI Elkton.[2] On June 18, 2020, the Marshall Project published an article *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, which documents the conditions at FCI Elkton, examines Mr. Desilva's COVID-19 diagnosis, and lays blame for the COVID-19 infections at FCI Elkton and

---

[2] See Mr. Desilva's Motion to Reduce Sentence at 5-6.

other FCI facilities at the BOP's feet.³ And recently the New York Times published a scathing opinion about the treatment of inmates by the BOP:

> "[T]he current crisis was born of both policy shortcomings and a widespread failure of implementation, not to mention general dysfunction. As detailed in a June report by the Marshall Project, federal prison officials have failed to protect inmates and the staff in numerous ways. . .
>
> America's inmates have been sentenced to pay their debt to society. That debt does not include falling victim to a lethal virus because of official incompetence." *The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars*, (June 25, 2020)⁴

These reports provide details about the potential risks Mr. Desilva faces at FCI Elkton.

As a reminder, Mr. Desilva was on a ventilator for 15 days due to COVID-19, and now suffers from a number of long term effects --- neuropathy, potential congestive heart failure, swelling in his lower extremities. In the last month, Mr. Desilva has visited Health Services at FCI Elkton on at least four occasions to receive help for his various conditions, and yet, he has not been evaluated or treated for congestive heart failure, and nor has he been evaluated for rehabilitative therapy relating to the ventilator use and his COVID-19 complications.⁵  His current condition substantially diminishes his ability to provide self-care, and at the same time,

---

³ Authored by Blakinger, Keri and Keegan Hamilton.  Attached as Exhibit A, and available at https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps.

⁴ Attached as Exhibit B and available at https://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html

⁵See Bernstein, Lenny, *Long Road Home,* Washington Post (June 9, 2020) https://www.washingtonpost.com/health/2020/06/09/coronavirus-ventilator-rehabilitation/?arc404=true , which outlines the therapy COVID-19 ventilator patients often require, and the life altering consequences of COVID-19.  See also
See also Belluck, Pam, *They Want to Kill Me*, New York Times (June 28, 2020) https://www.nytimes.com/2020/06/28/health/coronavirus-delirium-hallucinations.html, which discusses hospital delirium – "[d]elirium can have detrimental consequences long after it lifts, extending hospital stays, slowing recovery and increasing people's risk of developing depression or post-traumatic stress."

when he tries to get help, he is ignored. As Exhibits A and B exemplify, the BOP currently does not have the ability to provide proper care to inmates.

Finally, judges in the Central District of Illinois and around the country have found that a defendant's vulnerability to COVID-19 constitutes "extraordinary and compelling reasons" for relief. A non-exhaustive list from Illinois includes:

- *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to inmate who had served 19 years of 24-year sentence based on his vulnerability to COVID-19 because of hypertension, prostate issues, bladder issues, and a dental infection and because he is prediabetic);

- *United States v. Hansen*, No. 17-cr-50062, 2020 WL 2219068 (N.D. Ill. May 7, 2020) ("[T]he Court cannot discount the risk to Hansen if he contracts coronavirus, as reliable information places him in a higher-risk category.  Specifically, the presentence report documents that he suffers from diabetes, hypertension, high cholesterol, kidney disease, and chronic obstructive pulmonary disease, all of which are confirmed risk factors for serious illness if one contracts coronavirus.")

- *United States v. Early*, No. 09 CR 282, 2020 WL 2112371, at *2 (N.D. Ill. May 4, 2020) ("the Court cannot discount the risk to Mr. Early if he contracts coronavirus, as reliable information places him in a higher-risk category [62, diabetes and hypertension].  This, in the Court's view, qualifies as an extraordinary reason warranting consideration of a reduction of Mr. Early's sentence.");

There is no question that the First Step Act fundamentally changed the role of courts in the compassionate release process, vesting them with the authority to determine what constitutes extraordinary and compelling reasons for release.  This pandemic, as applied to Mr. Desilva, is an extraordinary and compelling circumstance.

**B. §3553 Factors Support a Sentence Reduction**

This Court must reevaluate Mr. Desilva under §3553(a) factors as required by §3582(c)(1)(A).  A reevaluation confirms that he should be granted compassionate release. In brief:

5

- The "characteristics of the defendant," under §3553(a)(1) now include a clean disciplinary record, a family that is willing to help him reenter the community, and various courses/job training while in custody.

- The long period (almost 16 years) he has served reflects the seriousness of his offenses, and satisfies the need for punishment and deterrence under §3553(a)(2)(A), (B) and (C).

- As his served to date is substantial, a reduction in sentence is not inconsistent with the need to avoid unwarranted sentencing disparity under §3553(a)(6).

- As the BOP cannot adequately treat or protect Mr. Desilva, the Court should consider Mr. Desilva's health in light of COVID-19 and that he could be re-infected again, in addition to the need for proper medical treatment.

The Government in its Response argues that Mr. Desilva is a risk to the community, and relies on Mr. Desilva's behavior from over 16 years ago, non-specific hearsay regarding alleged gang affiliation, and at the same time, the Government does not properly take into account his current status. A reduction in Mr. Desilva's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Mr. Desilva, whose ability to engage in basic self-protective measures is restricted—warrant relief.

The Sentencing Commission recently issued a recidivism study – *Length of Incarceration and Recidivism*[6], and one of the key findings was "that incarceration lengths of more than 120

---

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf

6

months had a deterrent effect." *Id.* at 14. Mr. Desilva is now 44 years old, and has served almost 16 years in custody. His disciplinary record shows no violations, and he is currently being held at a low security correctional institution. If the BOP believed that Mr. Desilva was a risk to society, why is he being held at a low security correctional institution and not at a high security correctional facility. He is also significantly ill, and clearly, he is well aware of the conditions inside the BOP, and knows the health risks he would face if he re-offends– that itself is a great deterrent.

### C. Release Plan

The release plan is detailed in the initial Motion for Sentence Reduction, and while the U.S. Probation Office did not make a recommendation as to the appropriateness or merits of the compassionate release, it did find that the proposed release plan is suitable. The government objects to the proposed release plan – it made a blanket statement in the Response that "given the present limitations on home visits and office appointments, the U.S. Probation Office would have very limited ability to supervise him." The Government provides no basis for this, and no specifics regarding their concerns. Mr. Desilva's release due in part to COVID-19 should not be stymied because of alleged limitations of supervision, limitations caused by COVID-19. Furthermore, there are various electronic means that the U.S. Probation Office could use that would accomplish the same purpose as home visits and office appointments.

## III. CONCLUSION

Mr. Desilva is more than the worst thing he has ever done, and deserves a second chance. His initial sentence back in 2006 was never meant to be a life sentence, but being left in a BOP facility given the current situation would likely be one. Mr. Desilva's underlying medical conditions make him especially vulnerable to COVID-19, constituting "extraordinary and

7

compelling reasons" for relief.  Mr. Desilva's release does not pose a danger to the community, and a balancing of the § 3553(a) factors with the risks to Mr. Desilva posed by COVID-19 warrants relief.  All these reasons provide extraordinary and compelling reasons for Mr. Desilva's release.

    WHEREFORE, Counsel respectfully requests that this Honorable Court grant Mr. Desilva compassionate release.

                  Respectfully submitted,

                  /s/ Renee Woodward
                  Renee Woodward

Renee Woodward
Woodward Law Office LLC
4256 N. Ravenswood, Suite 106
Chicago, IL 60613
(773) 242-9290
renee@woodwardlegal.com
Attorney for Defendant Johnny Desilva

## CERTIFICATE OF SERVICE

I, Renee Woodward, hereby certify that June 29, 2020, I caused a copy of the foregoing document to be served upon all counsel of record for all parties that have appeared via the Court's CM/ECF System.
*/s/ Renee Woodward*
Renee Woodward



Renee Woodward
Woodward Law Office LLC
4256 N. Ravenswood, Suite 106
Chicago, IL 60613
(773) 242-9290
renee@woodwardlegal.com